WILDMAN, HARROLD, ALLEN & DIXON LLP
Clinton J. McCord (SBN 204749)
mccord@wildman.com
9665 Wilshire Boulevard, Suite 200
Los Angeles, CA  90212
Telephone:      (310) 860-8700
Facsimile:      (310) 860-3800

Michael Dockterman (*of counsel*)
Jami A. Gekas (*of counsel*)
225 West Wacker Drive, Suite 2800
Chicago, IL 60606-1229
Telephone:      (312) 201-2000
Facsimile:      (312) 201-2555

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STARCOM MEDIAVEST GROUP, INC.,**<br><br>**Plaintiff,**<br><br>v.<br><br>**MEDIAVESTW.COM and JOHN DOES 1-5,**<br><br>**Defendants.** | CASE NO. C-10-04025-PVT<br><br>**NOTICE AND _EX PARTE_ APPLICATION OF PLAINTIFF STARCOM MEDIAVEST GROUP, INC. FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; [FRCP 65]**<br><br>**Date:**   N/A<br>**Time:**   N/A<br>**Courtroom:**   5 (4th Floor)<br>**Judge**:   Hon. Patricia V. Trumbull<br>**Action Filed**:   September 8, 2010<br>**Trial Date**:   TBD |

## _EX PARTE_ APPLICATION

Starcom Mediavest Group, Inc. hereby applies *ex parte* to this Court for a temporary restraining order ("TRO"):

1.     Immediately restraining and enjoining the Defendant domain name MEDIAVESTW.COM (the "Infringing Domain") from being used for any purpose, including without limitation in connection with a website or email services; and

---

**_EX PARTE_ APPLICATION FOR TEMPORARY RESTRAINING ORDER**

2.     Entering an order to show cause why a preliminary and/or permanent injunction should not be entered, restraining and enjoining Defendants from using the Infringing Domain name and/or the Registered Marks for any purpose and until final judgment is entered in this case on Plaintiff's claims for the forfeiture or transfer to Plaintiff of the domain name pursuant to 15. U.S.C. § 1125(d)(2)(D)(i).

Good cause exists for the foregoing Order.   As set forth in the accompanying *Memorandum of Points and Authorities* and supporting papers filed herewith, the Infringing Domain has been used in the recent past in connection with a number of criminal practices and as part of a scheme designed to deceive and defraud innocent parties, all the while infringing the intellectual property rights of the Plaintiff.   Defendants' conduct has already caused monetary loss to at least one of Plaintiff's trade partners, and if allowed to continue, will cause additional harm and risk to Plaintiff's business and the community.   Plaintiff has made numerous attempts to contact the Registrant of the Infringing Domain, but has been thwarted at every turn and is therefore unable to identify a proper party defendant to serve with the Complaint or notice of this Application.  Accordingly, a TRO should issue to preserve the *status quo*.

DATED:  September 9, 2010                          Respectfully submitted,

STARCOM MEDIAVEST GROUP, INC.

By:      _____/s/_____

WILDMAN, HARROLD, ALLEN & DIXON LLP
Clinton J. McCord (SBN 204749)
mccord@wildman.com
9665 Wilshire Boulevard, Suite 200
Los Angeles, CA  90212
Telephone:     (310) 860-8700
Facsimile:     (310) 860-3800

Michael Dockterman (*of counsel*)
Jami A. Gekas (*of counsel*)
225 West Wacker Drive, Suite 2800
Chicago, IL 60606-1229

---

*EX PARTE* **APPLICATION FOR TEMPORARY RESTRAINING ORDER**

## MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS

**INTRODUCTION** ........................................................................................................ 1

**TECHNOLOGY BACKGROUND** ................................................................................ 2

**BACKGROUND FACTS** ............................................................................................. 5

I.      SMG's Business. ................................................................................................ 5

II.     SMG's Intellectual Property. ............................................................................ 5

III.    The Imposter and His Fraudulent Use of the Infringing Domain to Rip Off SMG's
        Business Partners. ............................................................................................. 7

IV.     SMG's Attempts to Contact the Imposter and Work with the Relevant Domain Name
        Authorities. ...................................................................................................... 10

**LEGAL STANDARDS** ............................................................................................. 11

**ARGUMENT** ............................................................................................................ 12

I.      SMG is Likely To Succeed on the Merits of Its ACPA Claim. ..................... 12

        A.      SMG Is the Owner of Valid Federal Trademark Registrations. ............ 12
        B.      The Situs of The Infringing Domain Name is in This Judicial District. ..... 13
        C.      The Infringing Domain Name Violates SMG's Trademark Rights. .......... 13
        D.      *In Rem* Jurisdiction Is Appropriate Here. ........................................... 15

II.     The Benefit to SMG of a Temporary Restraining Order Far Outweighs Any Conceivable
        Harm to Defendants. ......................................................................................... 16

III.    The Public Interest Favors the Issuance of an Injunction. ............................. 17

**CONCLUSION** ....................................................................................................... 17

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
***EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**
Case No. C-10-04025-PVT

2099158

1

# TABLE OF AUTHORITIES

2

**Cases**

3
4

*American Girl, LLC v. Nameview, Inc.,*
    381 F. Supp. 2d 876 (E.D. Wis. 2005) ....................................................... 4

5

*AMF Inc. v. Sleekcraft Boats,*
    599 F.2d 341 (9th Cir. 1979)............................................................... 15, 16

6
7

*Apple Computer, Inc. v. Formula Int'l Inc.,*
    725 F.2d 521 (9th Cir. 1984)..................................................................... 16

8

*Ayres v. City of Chicago*
    125 F. 3d 1010 (7th Cir. 1997).................................................................. 19

9
10

*Bosley Medical Inst., Inc. v. Kremer,*
    403 F.3d 672 (9th Cir. 2005)....................................................................... 2

11
12

*Broadbridge Media, LLC v. HYPERCD.COM,*
    106 F. Supp. 2d 505 (S.D.N.Y. 2000) ..................................................... 13

13
14

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.,*
    174 F.3d 1036 (9th Cir. 1999)............................................................. 15, 17

15

*California ex rel Van De Kamp v. Tahoe Regional Planning Agency,*
    766 F.2d 1319 (9th Cir. 1985)................................................................... 18

16
17

*Ceasars World, Inc. v. Milanian,*
    247 F. Supp. 2d 1171 (D. Nev. 2003)....................................................... 16

18

*Con-Way Inc. v. CONWAYRACING.COM,*
    No. 08-4263 SC, 2009 WL 2252128 (N.D. Cal. July 28, 2009)......... 14, 17

19
20

*El Pollo Loco, Inc. v. Hashim,*
    316 F.3d 1032 (9th Cir. 2003)................................................................... 18

21
22

*GoTo.com, Inc. v. Walt Disney Co.,*
    202 F.3d 1199 (9th Cir. 2000)................................................................... 12

23

*Grocery Outlet Inc. v. Albertson's Inc.,*
    497 F.3d 949 (9th Cir. 2007)..................................................................... 12

24
25

*Habitat Educ. Ctr. v. U.S. Forest Svc.,*
    607 F.3d 453 (7th Cir. 2010)..................................................................... 18

26
27

*Int'l Order of Job's Daughters v. Lindeburg & Co.,*
    633 F.2d 912 (9th Cir. 1980)..................................................................... 19

28

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
***EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**
Case No. C-10-04025-PVT

2099158

*Lucent Tech., Inc. v. Lucentsucks.com,*
    95 F. Supp. 2d 528 (E.D. Va. 2000) ........................................................................5

*Mary Kay, Inc. v. Weber,*
    661 F. Supp. 2d 632 (N.D. Tex. 2009) .................................................................. 18

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.,*
    No. 10-Civ-1464, 2010 WL 808885 (S.D.N.Y. May 4, 2010) ................................. 18

*Ocean Garden, Inc. v. Marktrade Co., Inc.,*
    953 F.2d 500 (9th Cir. 1991) ................................................................................. 16

*Office Depot Inc. v Zuccarini,*
    596 F.3d 696 (9th Cir. 2010) ........................................................................... 4, 14

*Pacific Telesis v. Int'l Telesis Comms.,*
    994 F.2d 1364 (9th Cir. 1993) ............................................................................... 16

*Sammartano v. First Judicial Dist. Ct. in & for County of Carson*
    303 F.3d 959 (9th Cir. 2002) ................................................................................. 19

*Savin Corp. v. Rayne,*
    2001 U.S. Dist. LEXIS 20581 (D. Mass. 2001) ...................................................... 19

*Solid Host, NL v. Namecheap, Inc.,*
    652 F. Supp. 2d 1092 (C.D. Cal. 2009) .................................................................... 4

*Starcom MediaVest Group, Inc. v. BIZ.COM d/b/a CNOBIN.COM, et al.,*
    Case No. 3:09-cv-04553-SI (N.D. Cal. Sept. 25, 2009) ............................................ 2

*U.S. Cellular Inv. Of Los Angeles, Inc. v. AirTouch Cellular,*
    2000 WL 349002 (C.D. Cal. March. 27, 2000) ....................................................... 12

*Vision Sports, Inc. v. Melville Corporation,*
    888 F.2d 609 (9th Cir. 1989) ................................................................................. 12

**Statutes**

15 U.S.C. § 1115 .................................................................................................... 13

15 U.S.C. § 1125(d) .......................................................................................... passim

**Other Authorities**

FED. R. CIV. P. 65(b) ............................................................................................... 11

RESTATEMENT OF TORTS, § 729, Comment on Clause (b)f (1938) ............................... 15

S. Rep. No. 10-6-140 (1999) ...................................................................................... 2

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
***EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**
Case No. C-10-04025-PVT

2099158

### INTRODUCTION

Plaintiff Starcom Mediavest Group, Inc. is one of the largest communications companies in the world.  SMG's operating division MediaVest owns a business web site available from URL http://www.mediavestww.com ("MediaVest Site").  SMG's MediaVest division also owns the intellectual property on the site, including its trademarks and copyrighted material.  SMG brings this action to freeze activities related to an illegal domain name (mediavestw.com) ("Infringing Domain") that incorporates SMG's registered "MEDIAVEST" mark, in its entirety, and to stop an unknown scam artist from using the Infringing Domain to co-op SMG's valuable registered service marks in furtherance of his criminal endeavors.  This individual (the "Imposter"), who has alternately held himself out under the presumably fictitious names "John Wilson" and "John Kilson," has been using the Infringing Domain and SMG's STARCOM, MEDIAVEST and STARCOM MEDIAVEST GROUP marks to fraudulently pass himself off as an agent of SMG, in order to purchase online and radio advertising for an e-commerce site that illegally traffics in forged celebrity autographed items.

The relief SMG seeks in this Application is limited but essential: a "freeze" on use of the domain name pending an injunction hearing and entry of final judgment in this case.  For years, SMG has built a reputation for quality and integrity that is now being eroded by the use of an infringing domain name in connection with fraudulent, criminal activities.  SMG's trade partners have already actually confused SMG's established business with Defendants' "shady" operations, evidence that SMG's goodwill is at risk.  Although SMG has persuaded Yahoo! Inc. (the original DNS, or "domain name services," provider) to cease providing e-mail and web hosting services related to the Infringing Domain prior to bringing this Application, absent a court order, nothing is to stop the as-yet unidentified (and presently unidentifiable) registrant of the Infringing Domain from switching DNS providers and recommencing fraudulent activities. SMG will be irreparably harmed if the registrant, the Imposter and his/their cohorts are allowed to continue to use the Infringing Domain to interact with the marketplace, using knockoffs of SMG's marks.  The public—including both businesses and individual consumers—will also

---

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
***EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**
Case No. C-10-04025-PVT

2099158                                                              1

continue to suffer harm.  To contrast, the Defendants will suffer **no** harm if the Infringing Domain is frozen and the *status quo* is maintained, because they have no protectable interest in continuing to use a domain name to perpetrate fraud and in furtherance of illegal activities.

As SMG explains below and will further demonstrate at the TRO hearing, the Court should grant SMG's motion under basic and uncontroverted principals of trademark law as applied to the facts of this case.

### TECHNOLOGY BACKGROUND

This case is brought pursuant to the Anticybersquatting Consumer Protection Act ("ACPA"), a 1999 amendment to the Lanham Trademark Act.  *See* 15 U.S.C. § 1125(d). According to the Senate Report accompanying the ACPA, *cybersquatting* refers to the "deliberate, bad-faith, and abusive registration of Internet domain names in violation of the rights of trademark owners"; *cybersquatters* include criminals who "target distinctive marks to defraud consumers, including to engage in counterfeiting activities."  S. Rep. No. 10-6-140 (1999); *see also Bosley Medical Inst., Inc. v. Kremer*, 403 F.3d 672, 680 (9th Cir. 2005).  Often, imposters who attempt to place advertisements using fraudulent methods are also attempting to engage in *malvertising*, the harmful practice of using advertisements to push malevolent software or *malware* onto the computers of viewers of the pages on which the ads are placed.  *See, e.g.*, *Starcom MediaVest Group, Inc. v. BIZ.COM d/b/a CNOBIN.COM, et al.*, Case No. 3:09-cv-04553-SI (N.D. Cal. Sept. 25, 2009).

Earlier this year, the Ninth Circuit gave a general explanation of the "structure of the domain name system," which provides helpful background information on the technology relevant to an ACPA case such as this one:

> Every computer connected to the Internet has a unique Internet Protocol ("IP") address. IP addresses are long strings of numbers, such as 64.233.161.147. The Internet [domain name system] provides an alphanumeric shorthand for IP addresses. The hierarchy of each domain name is divided by periods. Thus, reading a domain name from right to left, the portion of the domain name to the right of the first period is the top-level domain

---

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
***EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**
Case No. C-10-04025-PVT

2099158                                    2

("TLD"). TLDs include .com, .gov, .net., and .biz. Each TLD is divided into second-level domains identified by the designation to the left of the first period, such as "example" in "example.com" or "example.net." ... Each domain name is unique and thus can only be registered to one entity....

A domain name is created when it is registered with the appropriate registry operator. A registry operator maintains the definitive database, or registry, that associates the registered domain names with the proper IP numbers for the respective domain name servers. The domain name servers direct Internet queries to the related web resources. A registrant can register a domain name only through companies that serve as registrars for second level domain names. Registrars accept registrations for new or expiring domain names, connect to the appropriate registry operator's TLD servers to determine whether the name is available, and register available domain names on behalf of registrants....

The majority of domain name registrations for commercial purposes utilize the .com TLD.

As explained in *Coalition for ICANN Transparency,* there are three primary actors in the domain name system. First, companies called "***registries***" operate a database (or "registry") for all domain names within the scope of their authority. Second, companies called "***registrars***" register domain names with registries on behalf of those who own the names. Registrars maintain an ownership record for each domain name they have registered with a registry. Action by a registrar is needed to transfer ownership of a domain name from one registrant to another. Third, individuals and companies called "***registrants***" own the domain names. Registrants interact with the registrars, who in turn interact with the registries.

*Office Depot Inc. v Zuccarini,* 596 F.3d 696, 698-99 (9th Cir. 2010) (internal citations omitted; emphasis added).

Under the domain name system, registrants are supposed to provide accurate contact information, which is available to the public via a database known as WHOIS:

The registry maintains a centralized, publicly accessible database of information concerning all domain names in a TLD, known as the Whois (or WHOIS) database; this database is compiled from information submitted by registrars. While there is only a single registry for each TLD, there are numerous competing registrars. Registrars control the IP addresses associated with particular

---

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
***EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**
Case No. C-10-04025-PVT

domain names. Customers seeking to register specific domain names interact with registrars; the registrars submit information regarding domain names to the registry, which includes the information in the public Whois database....

Generally, an individual seeking to use a domain name submits an online application to a registrar... The registrant must provide personal and contact information that becomes part of the Whois database. The Whois database "allows all registrars to determine almost instantaneously which domain names are already registered and therefore unavailable to others," and "allow[s] a person whose registration application for a particular domain name has been denied as unavailable to determine which registrar registered the name he desires with the Registry."...

*Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1095 (C.D. Cal. 2009) (internal citations omitted; emphasis added) (Morrow, J.).[1]

Nonetheless, not all information from WHOIS is accurate; indeed, those using domain names in furtherance of fraudulent or criminal activities are likely to provide false information.[2] This concern led to Congress' decision to provide a basis for *in rem* jurisdiction over domain names themselves:

Supporters of the ACPA were particularly concerned about anonymous trademark violators on the Internet. That is, they were troubled by the increasing trend of individuals registering domain names in violation of trademark rights and then eluding trademark enforcement because they could not be found. The Senate Judiciary Committee observed: "A significant problem faced by trademark owners in the fight against cybersquatting is the fact that many cybersquatters register domain names under aliases or otherwise provide false information in their registration applications in order to avoid identification and service of process by the mark owner." The Judiciary Committee believed that including an *in rem* provision in the ACPA would alleviate the

---

[1] *See also American Girl, LLC v. Nameview, Inc.*, 381 F. Supp. 2d 876 (E.D. Wis. 2005); *Smith v. Network Solutions, Inc.*, 135 F. Supp. 2d 1159 (N.D. Ala. 2001).

[2] For example, "there has been a growth in 'companies that will register domain names for individuals and act as a proxy by using the company's contact information.' Such services allow domain name registrants concerned with maintaining their privacy to remain anonymous. *Naturally, these services also appeal to registrants who wish to conceal their identities for illegitimate purposes.*" *Solid Host*, 652 F. Supp. 2d at 1096 (emphasis added).

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER
Case No. C-10-04025-PVT

2099158                                    4

> problem of anonymous cybersquatters, by allowing a mark owner
> to file an action against the domain name itself, provided it
> satisfied the court that it exercised due diligence in trying to locate
> the owner of the domain name but could not do so.

*Lucent Tech., Inc. v. Lucentsucks.com*, 95 F. Supp. 2d 528, 530 (E.D. Va. 2000).

## BACKGROUND FACTS

### I.  SMG's Business.

SMG is a global advertising and media services company that provides research, consulting, media planning and media buying services for its clients.  (*See* Declaration of Kevin Gallagher In Support of Temporary Restraining Order ("Gallagher Decl."),¶ 2; *see also* Complaint ¶ 15).  SMG conducts business through a number of "doing business as" ("DBA") operating divisions, including Starcom Worldwide, Spark Communications, SMG Performance Marketing, Pixel, and MediaVest.  (Gallagher Decl. ¶ 3).  Together, these various DBAs combine to make SMG one of the largest communications companies in the world, with more than 110 offices in 67 countries worldwide, and 6200 employees.  (*Id.*)

In the competitive advertising industry, an agency's reputation is of the utmost importance. (Gallagher Decl. ¶ 6).  Deals are often conducted on a "handshake" basis, meaning that if a publisher of advertisements is asked by a well-known and well-respected agency to place an advertisement, the publisher will typically proceed with the ad placement based on the agency's reputation, even if no written contract has been executed and no pre-payment has been made.  (*Id.* ¶ 14).  As such, anything that would cause clients, vendors or business partners to lose faith in an agency could have a seriously detrimental effect on business, in a way that might be hard to quantify.  (*Id.* ¶ 6).

### II.  SMG's Intellectual Property.

As a leader in the advertising industry, SMG has spent millions of dollars promoting its brands and business reputation, including the Starcom Worldwide and MediatVest divisions, with the MediaVest Site (available at URL http://www.mediavestww.com) being a critical

---

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
***EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**
Case No. C-10-04025-PVT

component of its MediaVest brand.  (*Id.* ¶¶ 2-5).   SMG's business and trade partners, clients and vendors rely on SMG's reputation for quality and integrity when choosing to do business with SMG and its various divisions.  (*Id.* ¶¶ 5-6).   SMG exercises diligence to maintain the security and integrity of the Mediavestwww.com Site and enforces its registered service marks as necessary, all as part of its overall business operation. (*Id.* ¶ 15).

On April 7, 1997, SMG's predecessor-in-interest filed an application for registration of its MEDIAVEST service mark in the United States Patent and Trademark Office (the "PTO"), and the mark was registered on August 10, 1999, covering the use of the mark in association with "advertising services, namely, placing and preparing advertising of others, purchase and procurement of media time, planning and research of print, radio, television and electronic advertising media use."   A copy of U.S. Trademark Registration No. 2,269,502 ("the '502 Registration") is attached to the Declaration of Patrick Mueller ("Mueller Decl.") as Exhibit U. This registration is valid and subsisting, and the mark is now incontestable.  In May, 2007, the '502 Registration was assigned to SMG, and the assignment was duly recorded with the PTO.

On April 14, 2009, SMG filed an application for registration of its STARCOM MEDIAVEST GROUP service mark with the PTO, and the mark was registered on May 4, 2010, covering the use of the mark on, *inter alia*, "advertising agency services."   A copy of U.S. Trademark Registration No. 3,783,544 ("the '544 Registration") is attached to the Mueller Decl. as Exhibit V.  This registration is valid and subsisting.

On February 20, 1997, SMG's predecessor-in-interest filed an application for registration of the STARCOM service mark with the PTO, and the mark was registered on February 9, 1999, covering use of the mark on "advertising agency services, including purchasing media time for advertisements of others and promoting events of others."   A copy of U.S. Trademark Registration No. 2,222,195 ("the '195 Registration") is attached to the Mueller Decl. as Exhibit W.  This registration is valid and subsisting, and the mark is now incontestable.  In February, 2009, the '195 Registration was assigned to SMG, and the assignment was duly recorded with the PTO.

---

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
***EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**
Case No. C-10-04025-PVT

SMG's MediaVest operating division is also the beneficial owner of common law trademark rights in, and the goodwill associated with the use of, the domain name MediaVestww.com.  The domain name is used in connection with the MediaVest Site, which promotes the various advertising services offered by MediaVest. (Gallagher Decl. ¶ 4).  Employees of MediaVest use email addresses in a format that clearly indicates their affiliation with MediaVest, such as, for example, "Firstname.Lastname@mediavestww.com."  (*Id.*)

Collectively, the common law trademark rights and goodwill in the MediaVestww.com, and the MEDIAVEST, STARCOM MEDIAVEST GROUP and STARCOM trademarks (as reflected in the '502, '544 and '195 Registrations, respectively) are hereinafter referred to as the "SMG MARKS."  The SMG MARKS have been extensively used and promoted throughout the United States and have come to represent an invaluable goodwill exclusively identifying SMG as the source of its various brands and the advertising services offered under them.  (Gallagher Decl. ¶¶ 3, 5).

### III. The Imposter and His Fraudulent Use of the Infringing Domain to Rip Off SMG's Business Partners.

On August 18, 2010, Kevin Gallagher, an Executive Vice President of SMG's Starcom Worldwide DBA ("Starcom") was contacted by Bill Barker of Clear Channel Communications ("Clear Channel").  (Gallagher Decl. ¶¶ 2, 7).  Clear Channel is a business partner of Starcom that operates over eight-hundred (800) radio stations nationwide and many of these radio stations have accompanying web sites.  (*Id.* ¶ 7).   There was and is a formal business relationship between the two companies for the placement of advertising on Clear Channel properties; in the context of this relationship, orders for advertisements are typically communicated by Starcom to a central division within Clear Channel (headed by Mr. Barker) and are then communicated and distributed by the Clear Channel central division to the relevant local radio station(s).  (*Id.*)

On August 18, Mr. Barker informed Starcom/SMG that Clear Channel had recently received multiple communications from an individual identifying himself as "John Wilson, Marketing Director, Starcom MediaVest Group."   (*Id.* ¶ 8).  Per Mr. Barker, this individual had

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
***EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**
Case No. C-10-04025-PVT

2099158                                                         7

contacted at least two different Clear Channel outlets to inquire about placement of Internet and radio advertisements on behalf of "AllAutograph.com," which "John Wilson" identified as a client of "Starcom Mediavest Group." (*Id.*)  Rather than work through Mr. Barker's team (who would have immediately been suspicious of a name and e-mail address they did not recognize), "John Wilson" communicated directly with the advertising sales personnel at individual Clear Channel stations, as demonstrated by the sample email below:[3]

-----Original Message-----
From: John Kilson [mailto:john.wilson@mediavestw.com]
Sent: Monday, August 09, 2010 13:46
To: ▆▆▆▆ Megan
Subject: Interested in Doing Some Advertisement

Hello Megan,
My name is John Wilson, I with Starcom Mediavest Group, were interested in doing some advertisement with 98 rock, I think your demographic work well with our particular client. Please give me a call at 312-451-5872.

John Wilson, Marketing Director
Starcom MediaVest Group
35 W. Wacker Drive
Chicago, IL 60601
Tel:(312)451-5872

None of the "John Wilson" messages sent to Clear Channel in August, 2010 were authorized by SMG or any of its operating divisions; indeed, there is no "John Wilson" employed by SMG or any of its DBAs as a "Marketing Director," and "AllAutograph.com" is not a client of SMG.   (*Id.* ¶ 10).  In short, ***all of the "John Wilson" emails are completely fraudulent***.   Yet it is easy to understand how these messages confused Clear Channel's local sales personnel (who were understandably enthusiastic about the prospect of selling advertising space to a large national agency) into believing that they were dealing with a legitimate company, because the Imposter was claiming an affiliation with SMG, using SMG's registered

---

[3] A copy of the full email chain including this message, together with additional examples of "John Wilson's" email correspondence with Clear Channel employees, comprise Exhibits A-F of the Gallagher declaration. Note that with the exception of Mr. Barker, the last names and contact information of individual Clear Channel employees have been redacted from all exhibits attached to the Gallagher declaration, for privacy and security reasons.  SMG will make unredacted versions of these exhibits available for the Court's *in camera* inspection, if the Court desires.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER
Case No. C-10-04025-PVT

2099158                                                    8

STARCOM MEDIAVEST GROUP trademark, and sending his messages from an email associated with the Infringing Domain (MEDIAVESTW.COM)—which differs by only one letter from the legitimate MediaVestw<u>w</u>.com domain name.  (*Id.* ¶¶ 11, 14).

Once SMG was made aware of the "John Wilson" situation by Clear Channel, SMG worked with Clear Channel to investigate the situation and put a stop to the fraud.  (*Id.* ¶ 15). SMG learned that on at least one occasion, the Imposter did convince a Clear Channel outlet to place and run two "home page takeovers" (banner advertisements) for "AllAutograph.com" on two local Clear Channel radio stations in New York, as indicated below:

**From:** [redacted] NAOMI [redacted] @clearchannel.com>
**To:** John Wilson <john.wilson@mediavestw.com>
**Sent:** Mon, August 16, 2010 9:00:59 AM
**Subject:** AllAutograph.com homepage takeovers today!
Good morning John

The takeovers for AllAutograph.com are live on our sites and look great!

Click the images below to see them and please let me know if there's anything else you need..



(*Id.* ¶ 13, see also Exhibit B thereto).  SMG also learned that the Imposter also communicated with, at a minimum, Clear Channel stations in Houston, San Diego and Los Angeles, all the while falsely holding himself out as an employee of SMG.  (*Id.* ¶¶ 16-19).  For example, when the Houston local station sought the formal name of the supposed SMG client to create an "IO,"[4]

---

[4] "IO" stands for "insertion order," which is a written authorization to print an advertisement or to broadcast a commercial; essentially, a purchase order used by advertising agencies or media representatives.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER
Case No. C-10-04025-PVT

2099158                                    9

the Imposter told the station to "[j]ust put the contract in our name, Starcom Mediavest," and represented that the "client" (AllAutograph.com) had "already prepaid." (*Id.* at Exhibit D). With the Los Angeles station, the Imposter went so far as to sign a written contract, (falsely) claiming to have authority to bind SMG. (*Id.* ¶ 16 and Exhibit C).

Eventually, Clear Channel became suspicious of "John Wilson," because a number of things just did not add up, including that the website "NE Autographs," which the advertised "AllAutograph.com" domain name redirects to, is identified on a popular consumer protection site, "Ripoff Report," as a retailer of forged celebrity autographed goods that is under investigation by the FBI. (*Id.* ¶ 12; *see also* Mueller Decl., ¶ 25 and Exhibit X). The matter was escalated to the attention of Mr. Barker, who alerted SMG, and also took protective measures at Clear Channel to prevent further fraud. (*See* Gallagher Decl. at Exhibit A, p. 1). Mr. Barker determined, with the help of Clear Channel's Information Technology department, that the Imposter had contacted Clear Channel local stations nearly 30 times from August 9 through August 19, 2010, using the Infringing Domain each and every time. (*Id* ¶ 20 and Exhibit G).

## IV. SMG's Attempts to Contact the Imposter and Work with the Relevant Domain Name Authorities.

Prior to filing this TRO Application, SMG has been extremely diligent in its attempts to put the Imposter on notice of SMG's claims. As detailed in the Mueller Declaration submitted in connection with this Application, SMG (by and through its counsel) has taken extensive steps to try to reach the Imposter and/or the Registrant of the Infringing Domain. Specifically, SMG has sent a "cease-and-desist" letter to the Imposter at multiple e-mail and postal addresses, but has not received any response whatsoever. (Mueller Decl. ¶¶ 4, 11-12, 15-16, 18-21, 26-27 and Exhibits A, J-K, P, and R-T thereto). In fact, a message sent by SMG to the e-mail address of record provided by the Registrant of the Infringing Domain was immediately returned as undeliverable, indicating that the Registrant's contact information was falsified. (*Id.* ¶ 21 and Exs. S-T thereto).

---

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
***EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**
Case No. C-10-04025-PVT

2099158                                                10

SMG has also done its best to resolve its issues directly with the various domain name authorities prior to seeking relief from this Court.  SMG reached out to Melbourne IT, the registrar of the Infringing Domain; VeriSign, Inc. ("VeriSign"), the registry of the Infringing Domain; and Yahoo! Inc. ("Yahoo"), the DNS provider.  (*Id.* ¶¶ 6-11, 17-19).  Melbourne IT has not responded to SMG (*id.* ¶ 7), while VeriSign has indicated that it will not take any action with respect to the Infringing Domain, absent a court order.  (*Id.* ¶ 19).  For its part, as of the date of this Application, Yahoo has ceased providing e-mail and web services for the Infringing Domain.  (*Id.* ¶ 9 and Exs. G-H).  But absent an order from this Court, there is nothing to stop the Imposter and his cohorts from transferring the Infringing Domain to a new DNS provider, and resuming their fraudulent activities.

## LEGAL STANDARDS

Pursuant to Rule 65, a TRO may issue without written or oral notice if specific facts in a declaration show that immediate and irreparable injury will result before the adverse party can be heard, and the movant's attorney certifies in writing any efforts made to give notice.  FED. R. CIV. P. 65(b).  In all other respects, the "standard for issuing a temporary restraining order is the same as the standard for issuing a preliminary injunction."  *U.S. Cellular Inv. Of Los Angeles, Inc.* v. *AirTouch Cellular*, 2000 WL 349002, at \*5 (C.D. Cal. March. 27, 2000).  A preliminary injunction should issue in a Lanham Act case where the moving party demonstrates either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) the existence of serious questions going to the merits and that the balance of  hardships tips sharply in its favor.  *Grocery Outlet Inc. v. Albertson's Inc.*, 497 F.3d 949, 951 (9th Cir. 2007) (affirming grant of preliminary injunction); *see also GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000) (reinstating preliminary injunction); *Vision Sports, Inc. v. Melville Corporation*, 888 F.2d 609, 612 (9th Cir. 1989) (affirming grant of preliminary injunction

Here, SMG's *in rem* claim is brought under the ACPA, 15 U.S.C. § 1125(d), which states:

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
***EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**
Case No. C-10-04025-PVT

2099158                                          11

(2)(A) The owner of a mark may file an in rem civil action against a domain name in the judicial district in which the domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name is located if

(i) the domain name violates any right of the owner of a mark registered in the Patent and trademark Office…; and

(ii) the court finds that the owner—

(I) is not able to obtain in personam jurisdiction over a person who would have been a defendant in a civil action under paragraph (1); or

(II) through due diligence was not able to find a person who would have been a defendant in a civil action under paragraph (1) …

So, to succeed on the merits of its ACPA claim, SMG must show that (1) it owns a registered trademark, (2) the domain name registry is located in this judicial district, (3) the domain name violates SMG's trademark rights in its registered marks; and (4) SMG is either unable to obtain personal jurisdiction over the owner of the domain name, or through due diligence is unable to find a person who could be a defendant.  15 U.S.C. § 1125(d); *see also Broadbridge Media, LLC v. HYPERCD.COM*, 106 F. Supp. 2d 505, 510 (S.D.N.Y. 2000) (granting preliminary injunction in *in rem* ACPA proceeding).

## ARGUMENT

SMG not only meets the Ninth Circuit's test for a temporary restraining order and preliminary injunctive relief, it exceeds it.  SMG is likely to succeed on the merits of its ACPA claim, and will most certainly face irreparable harm in the absence of a injunctive relief.  On the other hand, the relief that SMG seeks is measured and intended only to maintain the *status quo*, so it will not materially prejudice any party not before the Court.

**I.   SMG is Likely To Succeed on the Merits of Its ACPA Claim.**

**A.   SMG Is the Owner of Valid Federal Trademark Registrations.**

SMG easily passes the first hurdle necessary to its ACPA Claim, which requires that SMG establish itself as the "owner of a mark registered in the Patent and trademark Office."  15 U.S.C. § 1125(d)(2)(A)(i).   The '502, '544, 'and '195 Registrations, which cover the

---

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
***EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**
Case No. C-10-04025-PVT

2099158                                             12

MEDIAVEST, STARCOM MEDIAVEST GROUP and STARCOM marks, respectively, are all valid and subsisting federal trademark registrations.  Each registration serves as evidence (prima facie evidence, in the case of the '544 Registration and *conclusive* evidence, for the "incontestable" '502 and '195 Registrations) of the validity of the registered marks and registration of the marks, as well as SMG's ownership of the marks and exclusive rights to use them in commerce.  15 U.S.C. § 1115.

### B. The Situs of The Infringing Domain Name is in This Judicial District.

With respect to the second showing that SMG must make, Section 43(d)(2)(c) of the Lanham Act provides that for purposes of proceeding *in rem*:

> [A] domain name shall be deemed to have its situs in the judicial district in which—
>
> (i) the domain name registrar, registry, or other domain name authority that registered or assigned the domain name is located

In *Office Depot*, the Ninth Circuit referenced the ACPA and made clear that for ".com" domain names (including, obviously, the Infringing Domain), the registry is VeriSign, and so its headquarters in Mountain View, California, in this judicial district, can be considered the "situs" for all such domain names.  596 F.3d at 702-03.

### C. The Infringing Domain Name Violates SMG's Trademark Rights.

An ACPA plaintiff may establish that a domain name violates its trademark rights by showing that the registrant (or its authorized licensee) "has a bad faith intent to profit" from the registered mark, and "registers, traffics in, or uses a domain name" that is "identical or confusingly similar" to the plaintiff's registered mark.  *Con-Way Inc. v. CONWAYRACING.COM*, No. 08-4263 SC, 2009 WL 2252128, *3 (N.D. Cal. July 28, 2009) (slip op., Conti, J.).  Under the Lanham Act, the provision of "material and misleading false contact information when applying for the registration of the domain name" or the "intentional failure to maintain accurate contact information" can show "bad faith" for purposes of the ACPA.  15 U.S.C. § 1125(d)(1)(B)(i).  Here, not only did the Registrant of the Infringing

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
***EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**
Case No. C-10-04025-PVT

2099158

13

Domain supply false information and/or fail to keep it up (*see*, generally, Mueller Decl.), but the Imposter also affirmatively and expressly lied about his affiliation with SMG.  Thus bad faith is established.

Turning to whether the Infringing Domain is "confusingly similar" to SMG's registered trademark, a "likelihood of confusion"—the touchstone of any trademark infringement inquiry—exists when the similarity of the parties' marks is likely to confuse customers about the source of the products.  *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1053 (9th Cir. 1999).  In other words, confusion is likely if those viewing the accused infringer's mark will probably assume that the accused infringer's services are somehow associated with the plaintiff.  Analysis of likelihood of confusion in a Lanham Act trademark infringement case involves consideration of several factors, often referred to in the Ninth Circuit as the "Sleekcraft factors": (1) similarity of the parties' marks; (2) similarity of the parties' services; (3) marketing channels used; (4) the alleged infringer's intent in selecting the accused mark; (5) strength of the plaintiff's mark; (6) the type of services and degree of care exercised by purchasers; (7) evidence of actual confusion; and (8) likelihood of expansion of the product lines.  *See Brookfield*, 174 F.3d at 1054 (referring to eight "Sleekcraft factors" and granting preliminary injunction); *see also AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979) (identifying factors in trademark infringement context).

In analyzing a likelihood of confusion in the context of SMG's Application for a TRO, this Court is not required to consider all eight of the *Sleekcraft* factors.  *Apple Computer, Inc. v. Formula Int'l Inc.*, 725 F.2d 521, 526 (9th Cir. 1984) (noting that in granting a preliminary injunction, the parties will not have had sufficient opportunity to fully develop and present their cases, and the court will have only a brief opportunity to examine the *Sleekcraft* factors) (internal citations omitted).  Nevertheless, even at this early stage of the case, it is clear that a majority of the likelihood of confusion factors weigh in favor of SMG, establishing that SMG is highly likely to succeed on the merits.

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
***EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**
Case No. C-10-04025-PVT

2099158                                      14

In particular, the intent of the John Doe defendants is almost enough to establish a likelihood of confusion on its own.  *See Ocean Garden, Inc. v. Marktrade Co., Inc.*, 953 F.2d 500, 507 (9th Cir. 1991) (finding intent to be "the most damning element" against defendant, where it was shown that defendant changed its original "very distinguishable" trade dress to mimic plaintiff's trade dress, and affirming grant of preliminary injunction); *see also Pacific Telesis v. Int'l Telesis Comms.*, 994 F.2d 1364, 1369 (9th Cir. 1993) (finding intent was a critical factor and upholding injunction where district court found that the defendant intended to "benefit from the goodwill and reputation acquired by [the plaintiff]"), citing RESTATEMENT OF TORTS, § 729, Comment on Clause (b)f (1938).  If an accused infringer knowingly adopts a mark similar to another's, "courts will presume that it can achieve its purpose in deceiving the public." *Ceasars World, Inc. v. Milanian*, 247 F. Supp. 2d 1171, 1200 (D. Nev. 2003), citing *Sleekcraft*, 599 F.2d at 354.  In other words, to swing this factor its way, SMG is not required to show bad acts (although it can do so) by the defendants; it need merely establish that the John Doe Defendants used similar marks with actual or constructive knowledge of SMG's Marks. *Brookfield*, 174 F.3d at 1059.

### D.  *In Rem* Jurisdiction Is Appropriate Here.

As noted above, to bring an *in rem* action under the ACPA, a plaintiff must plead and prove that it is not able to obtain *in personam* jurisdiction over the person who **should** be the defendant in the ACPA action; in the alternative, the Court may find that the plaintiff "through due diligence was not able to find a person who would have been a defendant in a civil action." 15 U.S.C. § 1125(d)(2)(A)(ii); *see also Con-Way*, 2009 WL 2252128 at *1 (default judgment).

Here, *in rem* jurisdiction is appropriate.  Despite SMG's diligence in attempting to contact the Imposter, the Registrant of the Infringing Domain (if different than the Imposter), and even his/their supposed "clients" (*i.e.*, the people behind "AllAutograph.com"/NE Autographs) at multiple postal and e-mail address identified, including those identified in WHOIS (as detailed in the Mueller Declaration), SMG has received no response to its communications and has not been able to identify a single individual over whom personal jurisdiction can be asserted.  *C.f.*

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
***EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**
Case No. C-10-04025-PVT

2099158                                          15

*Con-Way*, 2009 WL 2252128 at *2.  Furthermore, the website associated with the domain name is passive (meaning it does not sell products or provide an interactive experience), and is thus "insufficient to confer jurisdiction."  *See id.*; Mueller Decl. ¶ 5 and Exhibit B.

## II. The Benefit to SMG of a Temporary Restraining Order Far Outweighs Any Conceivable Harm to Defendants.

Whoever the Imposter is, he does not have any right to use the Infringing Domain to pass himself off as an SMG employee or otherwise infringe SMG's registered marks.  Accordingly, there is no real hardship in freezing the Infringing Domain, so that it cannot be transferred to a new DNS provider and used in the short term to in furtherance of illegal and unauthorized conduct.[5]  *Mary Kay, Inc. v. Weber*, 661 F. Supp. 2d 632, 640 (N.D. Tex. 2009) (finding that balance of harm favored plaintiff where injunctive relief would only "require the defendants to bring their business into line with the requirements of the law").

On the other hand, for the reasons outlined above (*e.g.*, damage to SMG's reputation, name recognition, standing in the community and lost profits), SMG will be greatly harmed if Defendants' flagrant violations are permitted to continue.  Indeed, in trademark infringement cases, irreparable injury is ordinarily presumed once the plaintiff has established a likelihood of confusion.  *See El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1038 (9th Cir. 2003) (affirming preliminary injunction).  Accordingly the equities balance in favor of issuing injunctive relief. *Ayres v. City of Chicago* 125 F. 3d 1010, 1013 (7th Cir. 1997) (recognizing that even "a plaintiff who does not have a very high probability of ultimately prevailing will be entitled to preliminary relief if he faces very great irreparable harm and the defendant very little").

---

[5] In fact, because Defendants face no harm as a result of an injunction and could suffer no damages, minimal or even no bond should be required from Plaintiffs. *See Habitat Educ. Ctr. v. U.S. Forest Svc.*, 607 F.3d 453, 458 (7th Cir. 2010) ("There is no reason to require a bond" when the court is satisfied there is no danger the non-movant will be damaged); *see also New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, No. 10-Civ-1464, 2010 WL 808885, *34 (S.D.N.Y. May 4, 2010) (declining to require bond for preliminary injunction in Lanham Act case where defendant faced no harm and plaintiff had overwhelming likelihood of success on merits); *California ex rel Van De Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985) (likelihood of success on the merits tipped in favor of "minimal bond or no bond at all").

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER
Case No. C-10-04025-PVT

2099158                                                  16

### III. The Public Interest Favors the Issuance of an Injunction.

The public interest favors the issuance of an injunction in this case, immediately and without notice, because there is utility in eliminating continued fraud on the internet, and avoiding consumer confusion. *Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 918 (9th Cir. 1980); *see also Sammartano v. First Judicial Dist. Ct. in & for County of Carson* 303 F.3d 959, 974 (9th Cir. 2002) (the public interest inquiry addresses the impact of an injunction on nonparties). To contrast, there is no utility to the public in the use of the Infringing Domain name to commit fraud on other businesses and consumers, and "no public interest is served by allowing individuals to hold... domain names hostage." *Savin Corp. v. Rayne*, 2001 U.S. Dist. LEXIS 20581, 14-15 (D. Mass. 2001).

### CONCLUSION

Because the use of the Infringing Domain has resulted, and will continue to result unless enjoined, in trademark infringement and actual confusion in the marketplace, this Court should enter a temporary restraining order enjoining the use of the Infringing Domain to preserve the *status quo*, and setting an order to show cause for a preliminary and/or permanent injunction.

DATED:  September 9, 2010                    Respectfully submitted,

                                             STARCOM MEDIAVEST GROUP, INC.

                              By:      _____/s/_____
                                             WILDMAN, HARROLD, ALLEN & DIXON LLP
                                             Clinton J. McCord (SBN 204749)
                                             mccord@wildman.com
                                             9665 Wilshire Boulevard, Suite 200
                                             Los Angeles, CA  90212
                                             Telephone:    (310) 860-8700
                                             Facsimile:    (310) 860-3800

                                             Michael Dockterman (*of counsel*)
                                             Jami A. Gekas (*of counsel*)
                                             225 West Wacker Drive, Suite 2800
                                             Chicago, IL 60606-1229
                                             Telephone:    (312) 201-2000
                                             Facsimile:    (312) 201-2550

---

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
***EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**
Case No. C-10-04025-PVT